**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOSE JUAREZ,

                Petitioner,

    v.

W.L. MONTGOMERY, Warden,

                Respondent.

CASE NO. CV 18-06562-AS

**MEMORANDUM DECISION AND ORDER**

## I.  INTRODUCTION

On July 30, 2018, Jose Juarez ("Petitioner"), a California state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. (Dkt. No. 1).  On October 19, 2018, Respondent filed an Answer with an accompanying Memorandum of Points and Authorities.  ("Ans. Mem.," Dkt. No. 10).  Respondent also lodged documents from Petitioner's state proceedings, including the Clerk's Transcript ("CT") and Reporter's Transcript ("RT").  (Dkt. No. 11). On October 22, 2018, the Court issued an order advising Petitioner that he could file a

reply by November 19, 2018. (Dkt. No. 12). Petitioner has not done so.

The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. (Dkt. Nos. 2, 9, 13). For the reasons discussed below, the Petition is DENIED and this action is DISMISSED with prejudice.

## II.  PRIOR PROCEEDINGS

On March 19, 2015, after a joint jury trial with co-defendant Carlos Omar Sanchez, a Los Angeles County Superior Court jury found Petitioner guilty of second degree robbery in violation of California Penal Code ("P.C.") § 211 and evading a police officer in violation of California Vehicle Code § 2800.2(a). (CT 194-95, 203-04). The jury also found true the allegation that Petitioner used a firearm to commit the robbery, within the meaning of P.C. 12022.53(b). (CT 194). On April 21, 2015, the court sentenced Petitioner to nineteen years in state prison. (CT 266-71).

Petitioner and his co-defendant appealed their convictions to the California Court of Appeal, which issued an unpublished opinion on February 2, 2015 affirming the judgment, but ordering that a twenty dollar DNA assessment be stricken and Petitioner be awarded 376 days of presentence custody credit. (Lodgment No. 8). Petitioner filed a petition for review in the California Supreme Court (Lodgment No. 9), which summarily denied the petition on May 17, 2017. (Lodgment No. 11).

On February 13, 2018, Petitioner filed a habeas petition in Los Angeles County Superior Court, which the court denied on March 2, 2018, because it raised claims that had already been raised and denied on appeal. (Lodgment Nos. 12-13). On April 13, 2018, Petitioner filed a habeas petition in the California Supreme Court, which was summarily denied on July 11, 2018. (Lodgment Nos. 14-15). The instant Petition was filed in this Court on July 30, 2018.

## III. FACTUAL BACKGROUND

The California Court of Appeal reviewed Petitioner's claims on appeal together with the claims of co-defendant Sanchez. The following facts, taken from the California Court of Appeal's decision on direct review, have not been rebutted with clear and convincing evidence and must be presumed correct. 28 U.S.C. § 2254(e)(1); Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009).

In the early morning hours of May 30, 2014, Arnulfo Robles was riding his bicycle on a sidewalk in Whittier, California. A motorcycle drove up from behind and partially blocked Robles's path. There were two people on the motorcycle. The driver said, "Give me your phone." When Robles refused, the driver lifted up the back of his shirt to reveal a handgun, put his fingers around the gun's grip, and warned, "Don't make me." The passenger then added, "Hurry up and give him your phone."

Robles obliged, handing the phone to the passenger. The
motorcycle then sped away.

The entire encounter lasted about a minute.
Although both the driver and passenger were wearing
helmets, the helmets did not cover their eyes or noses,
and they had stopped "almost directly" under a
streetlight. Robles estimated that he looked at the
driver's face for approximately 10 to 15 seconds and at
the passenger's face for approximately four to six
seconds. He could not tell what race they were. Robles
said the driver was wearing a white shirt, blue jeans,
and had on a black helmet. Robles said the passenger was
wearing a gray sweater and had on a black helmet; Robles
did not notice any writing on the sweater.

After the motorcycle pulled away, Robles continued
to a friend's house and, once there, called 911. He
reported the robbery and told the 911 operator that the
passenger looked to be 12 or 13 years old based on his
stature on the motorcycle. Robles also activated the
"find my iPhone" function on his phone.

The police dispatcher broadcast a description of
the motorcycle involved in the robbery, and a patrol car
soon thereafter spotted a motorcycle matching that
description. The officers in that car activated their
lights and sirens. The motorcycle's driver then led them

on a high-speed chase during which time the motorcycle jumped on and off various freeways, sped more than 90 miles per hour, ran red lights and signals, and crossed multiple lanes of traffic without looking. Both officers were able to see that the driver was wearing a light-colored shirt, blue jeans, and unlike Robles reported, a white helmet; they saw the passenger wearing a gray top and a black helmet.

Police helicopters assisted with the pursuit. The observer in the first helicopter saw the driver wearing a white shirt, blue pants, and like the officers but unlike Robles reported, a white helmet, and the passenger wearing "like a gray shirt" and a black or dark-colored helmet. The observer in the second helicopter watched the motorcycle disappear under a freeway underpass and continue on with just the driver. Thereafter, the observer saw the driver leave the motorcycle and disappear into a neighborhood on foot.

Within five to ten minutes of losing sight of the motorcycle's occupants, police got word that Robles's iPhone was pinging from a house on South Concord Street. The house was just 1.4 miles from the location of the robbery. On a walkway right outside the house, police discovered an abandoned motorcycle and helmet. Less than 25 minutes later, several police officers entered the two-story house. The house was known to be inhabited by

squatters, and police found seven men - all in their late teens, 20s, and 80s - inside. [Petitioner] was hiding beneath insulation in the house's crawl-space attic, next to a bandana filled with live .38-caliber rounds. He was wearing black shorts and a black shirt. Sanchez was laying behind a couch on the first floor. He was wearing a gray sweatshirt with the letters "CALI" on the chest. Police found Robles's pinging iPhone in the second-floor bedroom; in the same bedroom, they recovered a pair of jeans and two shirts, one of which was a gray shirt with writing on the chest and left sleeve (in the same size as the gray sweatshirt with the letters "CALI"). Police also recovered a motorcycle helmet inside the house.

The police transported Robles in a police cruiser to a location two to three houses down from the house where they found his iPhone. They told Robles they had recovered his iPhone and brought him down "to look at who we caught ... who we arrested." Police then marched [Petitioner], Sanchez, and at least two of the house's other occupants into the street, one at a time, for approximately 30 seconds. Police did not ask any of those men to put on a helmet or to sit atop a motorcycle. Robles identified [Petitioner] as the driver and Sanchez as the passenger. Robles did not identify Sanchez based on his face, but rather because he "recognized" "his body, his buil[d]" and recognized the gray shirt.

1  Sanchez is five feet four inches tall. After Robles made

2  his identifications, the police said, "Good job, thank

3  you, things like that." Although Robles freely admitted

4  that he was brought to the house "to identify or look at

5  the people who had taken [his] phone" and was expecting

6  to find the robbers, Robles explained that he was not

7  going to "just identify anyone," and he did not identify

8  any of the other people he was shown as being involved

9  in the robbery.

10

11  (Lodgment No. 8 at 2-5).

12

13              **IV.   PETITIONER'S CLAIMS**

14

15     Petitioner raises the following claims for federal habeas

16  relief:

17

18  Ground One:    Petitioner's trial counsel rendered ineffective

19                 assistance by failing to move to suppress Robles's

20                 field identification based on the loss of evidence.

21

22  Ground Two:    The trial court erred by failing to instruct the

23                 jury to begin deliberating anew after an alternate

24                 juror was seated.

25

26  (Petition at 5, 9).

27

28

# V. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, 562 U.S. 86, 98 (2011). Under AEDPA's deferential standard, a federal court may grant habeas relief only if the state court adjudication was contrary to or an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts. 28 U.S.C. § 2254(d). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted).

Petitioner raised Ground One is his petition on direct review in the California Supreme Court (Lodgment No. 9), and he later raised Grounds One and Two in his habeas petition in the California Supreme Court. (Lodgment No. 14). Both petitions were denied without comment or citation to authority. (Lodgment Nos. 11, 15). The Court "looks through" the California Supreme Court's silent denial to the last reasoned decision as the basis for the state court's judgment. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); Cannedy v. Adams, 706 F.3d 1148, 1159, as amended, 733 F.3d 794 (9th Cir.

2013) ("[W]e conclude that <u>Richter</u> does not change our practice of 'looking through' summary denials to the last reasoned decision – whether those denials are on the merits or denials of discretionary review.") (footnote omitted). Therefore, the Court will consider the Court of Appeal's reasoned opinion addressing Grounds One and Two on direct review. <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 380 (2010); <u>see also</u> <u>Gonzalez v. Brown</u>, 585 F.3d 1202, 1206 (9th Cir. 2009) (federal habeas courts "apply AEDPA deference to any state court decision on the merits").

## VI.  DISCUSSION

### A.  Ineffective Assistance of Counsel (Ground One)

In Ground One, Petitioner claims that his trial counsel was ineffective by failing to move to suppress the field identification of the witness, Robles, due to the loss of evidence.[1]  (Petition at 5, 9).

### 1.  California Court of Appeal's Opinion

The California Court of Appeal denied Petitioner's ineffective assistance of counsel claim, stating:

---

[1] On direct appeal in the California Court of Appeal and the California Supreme Court, Petitioner additionally argued that his trial counsel was ineffective for not moving to suppress the identification as unconstitutionally suggestive.  (Lodgment Nos. 3, 9).  His Petition here, however, does not mention this basis.

Police officers filled out field identification cards on the five people other than [Petitioner] and Sanchez found inside the South Concord Street house along with Robles's iPhone. At some point thereafter, they lost those cards. [Petitioner and Sanchez] argue that this error makes it impossible for them to identify the other inhabitants of the South Concord Street house and to reconstruct the showup procedure at which Robles identified [Petitioner] and Sanchez, and violates due process because it constitutes either (1) the suppression of material evidence, in violation of Brady v. Maryland (1963) 373 U.S. 83 (Brady), or (2) the destruction of material evidence, in violation of California v. Trombetta (1984) 467 U.S. 479 (Trombetta).

The police's failure to preserve the field identification cards does not violate Brady. Under Brady, prosecutors have a duty not to suppress evidence that is favorable to the defense and material if that evidence is in their possession. (People v. Masters (2016) 62 Cal.4th 1019, 1066-1067.) Here, the field identification cards were lost; they were accordingly not in the possession of either the prosecutor or the investigating agency. This is fatal to any Brady claim. (People v. Lucas (2014) 60 Cal.4th 153, 221 (Lucas) ["[t]he constitutional due process rights of a defendant may be implicated when he or she is denied access to favorable evidence in the prosecution's possession,"

italics added], overruled on other grounds in <u>People v. Romero and Self</u> (2015) 62 Cal.4th 1; <u>People v. Whalen</u> (2013) 56 Cal.4th 1, 64 [<u>Brady</u> mandates disclosure of evidence in the prosecution team's "possession"].)[3]

[Fn. 3] We accordingly have no occasion to decide whether the field identification cards are either favorable to the defense or material.

The police's failure to preserve the field identification cards also does not violate <u>Trombetta</u>. <u>Trombetta</u> applies when the state "fail[s] to preserve evidence." (<u>Lucas</u>, <u>supra</u>, 60 Cal.4th at p. 221.) <u>Trombetta</u> and its follow-on case, <u>Arizona v. Youngblood</u> (1988) 488 U.S. 51, place two duties on police agencies with regard to preserving evidence: If the evidence has "apparent" "exculpatory value" and cannot be obtained "'by other reasonably available means,'" its destruction violates due process; however, if the evidence might be useful to the defense but does not have "apparent" "exculpatory value," its destruction violates due process only if the police act in bad faith. (<u>People v. Carrasco</u> (2014) 59 Cal.4th 924, 961-962; <u>People v. DePriest</u> (2007) 42 Cal.4th 1, 41-42.) The names and contact information of the five other people inside the South Concord Street house does not have "apparent" "exculpatory value" because it is unclear whether reconstructing the showup with them would undermine or

11

confirm Robles's positive identifications of [Petitioner] and Sanchez. Moreover, there is no evidence that the police acted in bad faith in losing the field identification cards. Thus, [Petitioner and Sanchez] cannot meet the pertinent standards for relief under Trombetta and its progeny.

[Petitioner and Sanchez] point us to two groups of cases, suggesting that they establish that the loss of the field identification cards is enough by itself to warrant suppression of all of Robles's identifications. First, they cite People v. Ratliff (1986) 41 Cal. 3d 675 and People v. Posten (1980) 108 Cal.App.3d 633. To be sure, both of these cases indicate that the destruction of evidence relating to an out-of-court identification by itself warrants suppression of that identification. (Ratliff, at p. 690; Posten, at pp. 646-647.) But both of these cases cite People v. Hitch (1974) 12 Cal. 3d 641 as support for their rule. (Ratliff, at p. 690; Posten, at p. 646.) Our Supreme Court has subsequently held that "Hitch ... has not survived Trombetta." (People v. Johnson (1989) 47 Cal.3d 1194, 1234.) Consequently, the Hitch-based rule in Ratliff and Posten is no longer good law. Second, [Petitioner and Sanchez] point us to three federal decisions that are at least 45 years old. (See United States v. Augello (2d Cir. 1971) 451 F.2d 1167; United States v. Bryant (D.C. Cir. 1971) 448 F.2d 1182; United States v. Heath (9th Cir. 1958)

260 F.2d 623.) They do not apply the pertinent legal standard announced in <u>Trombetta</u> and are, for that reason alone, irrelevant.

(Lodgment No. 8 at 10-13).

2.  **Analysis**

To succeed on a Sixth Amendment ineffective assistance of trial counsel claim, a petitioner must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). The petitioner bears the burden of establishing both components. <u>Williams v. Taylor</u>, 529 U.S. 362, 390-91 (2000); <u>Strickland</u>, 466 U.S. at 687. "To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." <u>Richter</u>, 562 U.S. at 104 (citation omitted). Prejudice "focuses on the question whether counsel's deficient performance renders the results of the trial unreliable or the proceeding fundamentally unfair." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993); <u>accord</u> <u>Williams</u>, 529 U.S. at 393 n.17. That is, a petitioner must establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>Strickland</u>, 466 U.S. at 694, and "[t]he likelihood of a different result must be substantial, not just conceivable," <u>Richter</u>, 562 U.S. at 112. Thus, counsel's errors must be "so serious as to deprive the defendant of a fair

13

trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687.

Here, Petitioner claims that his trial counsel provided ineffective assistance by failing to move to suppress the victim's field identification of Petitioner. (Petition at 5, 9). Petitioner argues that the identification evidence should have been suppressed because the officers lost the identities of the other individuals present during the identification, and "neither the officers nor the victim could recall critical details of the procedures employed." (<u>Id.</u> at 9).

The field identification at issue took place by the house where the officers had located the apparent robbery suspects and the phone that had been taken from victim Robles. Robles testified that officers took him to the location about four hours after the robbery incident. (CT 17). At the preliminary hearing, he stated that he was presented with three or four possible suspects, including Petitioner and his co-defendant, Sanchez, but Robles could not remember the order in which they were presented. (CT 18). At trial, he testified that he thought he was shown a total of five people. (5 RT 2421). He testified that they were shown to him while he was seated in the back of a police car, and the suspects were taken into the street about two houses away. (4 RT 2162-2170; 5 RT 2417, 2421). Robles testified that he immediately excluded the others as possible suspects, and he identified Petitioner and Sanchez. (CT 19-20).

Officer Merida, who was present for the identification, testified that there were five other people in the house, aside from Petitioner and Sanchez. (CT 45). Field interview cards were created for all of them, but the officers did not know what happened to the cards. (CT 45-46; 5 RT 2461, 2507-2508). The police report did not list these five other witnesses, and they were not residents of the house. (5 RT 2467-2468). Officer Merida testified that Petitioner, Sanchez, and "one or two" others were shown to the victim as possible suspects, and the victim identified Petitioner and Sanchez as the perpetrators. (CT 46-47).

Petitioner has failed to show that there would have been any merit to a motion to suppress the identification based on missing evidence. To the contrary, the California Court of Appeal reasonably concluded that there was no Brady or Trombetta violation to warrant excluding the identification. A Brady violation occurs when the prosecution withholds evidence that is material and "favorable to the accused, either because it is exculpatory, or because it is impeaching." Banks v. Dretke, 540 U.S. 668, 691 (2004); see Brady v. Maryland, 373 U.S. 83 (1963). Brady is inapplicable here because the evidence at issue was lost by the officers, not suppressed by the prosecution, and its loss left a court no way to ascertain whether it was material or favorable to Petitioner. Trombetta, on the other hand, applies to lost evidence, but a Trombetta violation occurs only when the lost or destroyed evidence "possess[es] an exculpatory value that was apparent before the evidence was [lost or] destroyed, and [is] of such a nature that the defendant would be unable to obtain

comparable evidence by other reasonably available means."
California v. Trombetta, 467 U.S. 479, 489 (1984); United States
v. Bingham, 653 F.3d 983, 994 (9th Cir. 2011). Moreover, the
failure to preserve such evidence violates due process only if the
criminal defendant "can show bad faith on the part of the police."
Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Mere negligence
does not suffice. Id.; Grisby v. Blodgett, 130 F.3d 365, 371 (9th
Cir. 1997); see also United States v. Flyer, 633 F.3d 911, 916 (9th
Cir. 2011) ("Bad faith requires more than mere negligence or
recklessness."). Here, there is nothing in the record to suggest
any missing evidence regarding the field identification would have
had apparent exculpatory value, or that the loss of such evidence
was the result of bad faith.

Because a motion to suppress the field identification would
have been meritless, Petitioner's trial counsel was not ineffective
in failing to make such a motion. See Petrocelli v. Baker, 869
F.3d 710, 723 (9th Cir. 2017) ("A failure to make a motion to
suppress that is unlikely to succeed generally does not constitute
ineffective assistance of counsel."); Zapien v. Martel, 849 F.3d
787, 796 (9th Cir. 2016) (petitioner did not receive ineffective
assistance of counsel when "[c]ompetent counsel could reasonably
have concluded that moving to exclude [evidence] on the grounds
Zapien now suggests would have seemed frivolous"); see also Premo
v. Moore, 562 U.S. 115, 124 (2011) ("[T]he first and independent
explanation – that suppression would have been futile – confirms
that [trial counsel's] representation was adequate under
Strickland, or at least that it would have been reasonable for the

state court to reach that conclusion."). Accordingly, the California Court of Appeal's determination that trial counsel was not ineffective by failing to move to suppress the field identification in light of lost evidence was not contrary to, or an unreasonable application of, clearly established federal law.[2]

---

[2] Although Petitioner does not argue, here, that suppression was warranted also because the field identification was "impermissibly suggestive," that basis would also lack merit. For a witness identification procedure to be "impermissibly suggestive," it must "give rise to a very substantial likelihood of irreparable misidentification." Sexton v. Beaudreaux, 138 S. Ct. 2555, 2559 (2018) (internal quotation and citation omitted). Even then, suppression is not required unless the identification procedure was also unnecessary and otherwise unreliable based on the totality of the circumstances. Perry v. New Hampshire, 565 U.S. 228, 239 (2012); People v. Clark, 63 Cal. 4th 522, 556 (2016). The Supreme Court recently noted that it "has held that pretrial identification procedures violated the Due Process Clause only once," in Foster v. California, 394 U.S. 440 (1969). Sexton, 138 S. Ct. at 2559. Foster involved "two highly suggestive lineups and 'a one-to-one confrontation,' which 'made it all but inevitable that [the witness] would identify [the defendant].'" Id. (quoting Foster, 394 U.S. at 443).

The standard here, on habeas review of a state prisoner's Strickland claim, is even harder to overcome. Indeed, the deference that this Court owes to the California Court of Appeal's decision is "near its apex in this case, which involves a Strickland claim based on a motion that turns on general, fact-driven standards such as suggestiveness and reliability." Id. at 2560. In this case, the California Court of Appeal concluded that the field identification procedure was not unduly suggestive in part because "the police showed Robles more than the number of persons involved in the crime; the police did not tell or otherwise intimate to Robles which persons he should select; and Robles did, in fact, select some suspects and not select others." (Lodgment 8 at 15). The Court of Appeal thus denied Petitioner's claim that his trial counsel was ineffective by failing to move to suppress the field identification due to its suggestiveness. (See id. at 9-16). Because this Court cannot say that determination was unreasonable, Petitioner's claim on that basis would fail.

**B.    Instructional Error (Ground Two)**

In Ground Two, Petitioner claims that the trial court violated his rights by failing to instruct the jury to begin deliberating anew after an alternate juror was seated.  (Petition at 5).

**1.    California Court of Appeal's Opinion**

The California Court of Appeal rejected Petitioner's claim, stating:

> The parties presented evidence for four days; the jury was instructed on the law and the parties made their closing arguments on the fifth day. The jury began to deliberate at 4:01 p.m. on that fifth day and deliberated for 27 minutes before breaking for the evening. The next morning, the trial court excused one of the jurors and substituted in one of the alternate jurors. When the court did so, the court instructed the jury to "[g]o back to the deliberation room and begin your deliberations." The jury deliberated for 17 minutes prior to lunch and 92 minutes after lunch before reaching its verdicts. [Petitioner] and Sanchez argue that the court's failure to tell the jury that it needed to disregard its deliberations occurring prior to the substitution violated their right to a 12-member jury under the California Constitution. Because this claim turns on the application of law to undisputed facts, our

review is de novo. (<u>People v. Christman</u> (2014) 229
Cal.App.4th 810, 815.)

A trial court has the discretion under section 1089
to discharge a juror in the midst of deliberations and
to have "an alternate ... take a place in the jury box,
... subject to the same rules and regulations as though
the alternate juror had been selected as one of the
original jurors." To give effect to the California
Constitution's guarantee that a criminal jury "shall
consist of 12 persons" (Cal. Const., art. I, § 16) and
to ensure the jury's verdict is a product of the
deliberations of those "12 persons," a court may only
exercise its power to substitute in an alternate juror
if it "instruct[s] the jury to set aside and disregard
all past deliberations and begin deliberating anew."
(<u>People v. Collins</u> (1976) 17 Cal. 3d 687, 694, overruled
on other grounds in <u>People v. Boyette</u> (2002) 29 Cal.4th
381, 462, fn. 19; <u>People v. Renteria</u> (2001) 93
Cal.App.4th 552, 558-559 (<u>Renteria</u>); <u>accord</u>, CALCRIM No.
3575 [so instructing].) A trial court does not satisfy
this requirement by telling the jury to "'resume their
deliberations starting over with the new trial juror'"
(<u>People v. Martinez</u> (1984) 159 Cal.App.3d 661, 665
(<u>Martinez</u>), italics omitted); by telling the jury to
start its deliberations "'from scratch so that [the
alternate juror] has full benefit of everything that has
gone on ... up to the present time'" (<u>People v. Odle</u>

19

(1988) 45 Cal. 3d 386, 405); or by implicitly treating the prior jury's deliberations as effective by responding to the prior jury's request for a readback of testimony (People v. Guillen (2014) 227 Cal.App.4th 934, 1030 (Guillen)).

Under these standards, the trial court's instruction in this case was deficient. The court told the jury to "begin [its] deliberations," but the jury had by that point already been in deliberations for 27 minutes. To be sure, as we discuss below, it is far from clear that the jury in that brief time did more than discharge its first duty to select a foreperson. But the jury had met to deliberate, and the trial court's failure to instruct the jury to "disregard" any prior deliberations was error. (Accord, Martinez, supra, 159 Cal.App.3d at p. 665.)

This error, however, does not always mandate reversal. (Renteria, supra, 93 Cal.App.4th at p. 559.) Instead, reversal is required only if it is reasonably probable that a "more favorable verdict would have been returned had the jury been properly instructed following the substitution." (Martinez, supra, 159 Cal.App.3d at p. 665, citing People v. Watson (1956) 46 Cal.2d 818, 836.) In assessing whether such a reasonable probability exists in this context, courts look to (1) "'whether the case is a close one,'" and (2) a "'compar[ison of] the

time the jury spent deliberating before and after the substitution of the alternate juror.'" (People v. Proctor (1992) 4 Cal.4th 499, 537.) The two factors interact: Where a jury has convened for a sufficient period of time prior to the substitution for it to have deliberated on the merits and where it is a close case, courts have concluded that a different result is reasonably probable. (Renteria, at pp. 560-561 [jury deliberates for "some hours" prior to substitution, deliberates for "30 minutes" afterwards, and the case is "close"; reversal warranted]; Martinez, at pp. 665-666 [jury deliberates for two and one-quarter hours prior to substitution, deliberates for six days afterwards, and the case is "close"; reversal warranted].) Where the case is not close or the pre-substitution deliberations are "minimal," courts have declined to hold that a different result is reasonably probable. (Proctor, at pp. 536-538 [jury deliberates for less than an hour prior to substitution, deliberates for two and one-half days afterwards, and "strong evidence" against the defendant; reversal not warranted]; Guillen, supra, 227 Cal.App.4th at pp. 1031-1032 [jury deliberates briefly prior to substitution, deliberates nine days afterwards, and strong evidence on lesser included offense on which guilty verdict was returned; reversal not warranted].)

Applying these factors, we conclude a different verdict is not reasonably probable in this case. As we

discuss below when assessing the sufficiency of the
evidence, the evidence in this case is far from
overwhelming, but this is also not a "close case." More
importantly, the jury in this case only met for 27
minutes prior to the substitution; this is a "minimal"
amount of time, not enough for the jury to engage in any
meaningful deliberation on the merits that it would need
to be told to disregard. What is more, the jury then
took a far greater amount of time – indeed, four times
as long as its pre-substitution meeting – to deliberate
once the alternate juror joined the jury. On these facts,
the instructional error does not warrant reversal.

(Lodgment No. 8 at 6-9)

## 2. Analysis

Because habeas relief under § 2254 is available only for
violations of clearly established federal law, challenges to jury
instructions in state trials generally do not warrant federal
habeas relief. See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th
Cir. 1983); Hernandez v. McGrath, 595 F. Supp. 2d 1111, 1141 (E.D.
Cal. 2009) ("Failure to give an instruction which might be proper
as a matter of state law does not amount to a federal constitutional
violation."). Instructional error warrants federal habeas relief
only if the "instruction by itself so infected the entire trial
that the resulting conviction violates due process." Waddington
v. Sarausad, 555 U.S. 179, 191 (2009) (citation and internal

quotation marks omitted); Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam); Estelle v. McGuire, 502 U.S. 62, 72 (1991); Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). A petitioner challenging the failure to give an instruction bears an "especially heavy" burden because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977); Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997); Hendrix v. Vasquez, 974 F.2d 1099, 1106 (9th Cir. 1992). Whether a constitutional violation occurred must be evaluated in the context of the instructions as a whole and the entire trial record (including the arguments of counsel). Estelle, 502 U.S. at 72; Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995). Moreover, if a constitutional error occurred, federal habeas relief remains unwarranted unless the error caused prejudice, i.e., unless it had a substantial and injurious effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 61-62 (2008) (per curiam) (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

Here, Petitioner seeks relief due to the trial court's failure to instruct the jury to begin deliberations anew after it substituted an alternate juror. However, there is no clearly established constitutional right to such an instruction. See Tate v. Bock, 271 F. App'x 520, 523 (6th Cir. 2008) (finding no Supreme Court authority that "clearly establishes a constitutional right to have the jury instructed to deliberate anew after an alternate is empaneled"); Peek v. Kemp, 784 F.2d 1479, 1485 (11th Cir. 1986) (petitioner suffered no constitutional deprivation of his

23

constitutional rights when the trial court substituted a juror
without instructing the jury to begin its deliberations anew);
United States v. Evans, 635 F.2d 1124, 1128 (4th Cir. 1980)
(rejecting defendant's contention that his rights were violated
due to the trial court's failure to specifically instruct the jury
to begin deliberations anew after addition of alternate juror
because "[n]othing precluded the jury from starting from the very
beginning all over again," and "[t]he speculative assertion of
prejudice from the unexceptional instruction, to which no objection
was raised, was insufficient to justify reversal"); Ortega v.
Seibel, 2017 WL 3033421, at *15 (C.D. Cal. July 12, 2017) (noting
that federal courts in this and other circuits have indicated that
there is no constitutional requirement to instruct a jury to begin
deliberations anew upon seating an alternate juror (citing cases));
Hernandez v. McGrath, 595 F. Supp. 2d 1111, 1141 (E.D. Cal. 2009)
(finding no Supreme Court authority requiring that a specific
instruction be given to the jury after an alternate has been
substituted for a deliberating juror); Hernandez v. Jacquez, 2011
WL 1155465, at *6 (C.D. Cal. Feb. 22, 2011) (same); Venegas v.
Uribe, 2011 WL 4104693, at *7 (C.D. Cal. July 29, 2011) (same);
Baca v. Scribner, 2008 WL 850309, at *6 (E.D. Cal. Mar. 28, 2008)
(same). Thus, regardless of whether it was error under California
law, the trial court's failure to provide the instruction did not
violate Petitioner's clearly established constitutional rights.

Furthermore, the California Court of Appeal appropriately
applied harmless error analysis to this issue. See, e.g., Hedgpeth
v. Pulido, 555 U.S. 57 (2008) (instructional errors that do not

24

"categorically 'vitiat[e] all the jury's findings'" are subject to harmless error analysis); Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (instructional error is subject to harmless error analysis). The California Court of Appeal found no prejudice in the trial court's failure to instruct the jury to begin deliberations anew after substituting a juror, particularly because the jury had met for only twenty-seven minutes prior to the substitution, and they deliberated for "four times as long" after. (Lodgment 8 at 9). As the Court of Appeal pointed out, the twenty-seven minutes of pre-substitution deliberation was "a 'minimal' amount of time, not enough for the jury to engage in any meaningful deliberation on the merits that it would need to be told to disregard." (Id.). The Court cannot say that the Court of Appeal's finding of no prejudice was objectively unreasonable. See Ortega v. Seibel, No. 2017 WL 033421, at *16 (C.D. Cal. July 12, 2017) (no prejudice in state trial court's failure to instruct jury to begin deliberations anew with alternate juror in part because "the jury spent less time deliberating before the substitution — for 1 hour and 15 minutes — than after the substitution — for 1 hour and 40 minutes," which "indicates that the alternate juror fully participated in the deliberations leading to the verdicts"); Hernandez v. Jacquez, 2011 WL 1155465, at *8 (C.D. Cal. Feb. 22, 2011) (fact that jury spent nearly same amount of time deliberating both before and after substitution "supports the conclusion that petitioner was not prejudiced by the trial court's failure to instruct the jury to begin deliberations anew"); Baca v. Scribner, 2008 WL 850309, at *6 (E.D. Cal. Mar. 28, 2008) (no prejudice in state court's failure to instruct jury to begin deliberations anew

1  when alternate juror was seated after less than three hours of

2  deliberation, and jury proceeded to deliberate for seven days with

3  alternate juror before reaching verdict).

4

5     Accordingly, the California Supreme Court's rejection of

6  Petitioner's Ground Two was not contrary to, or an unreasonable

7  application of, clearly established federal law.

8

9               **VII.  ORDER**

10

11     For the reasons stated above, IT IS ORDERED that the Petition

12  for Writ of Habeas Corpus is denied and this action is dismissed

13  with prejudice.

14

15  DATED:  January 15, 2019.

16

17                              /s/

                              ALKA SAGAR

18                    UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28